UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL S. DENGSAVANG,

          Petitioner,

v.                                                                              Case No. 19-CV-333

JASON BENZEL,[1]

          Respondent.

## DECISION AND ORDER

Michael S. Dengsavang is currently incarcerated at Dodge Correctional Institution pursuant to a state-court judgment convicting him of attempted first-degree intentional homicide, armed robbery with use of force, and burglary. After his state appeals were rejected, Dengsavang filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is in custody in violation of the United States Constitution because both his trial and appellate lawyer provided ineffective assistance of counsel.

---

[1] Jason Benzel is now the warden at Dodge Correctional Institution, where Dengsavang is presently confined. Accordingly, William J. Pollard is terminated as the named respondent and replaced with Benzel pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

BACKGROUND

On December 13, 2009, as the owners of the Happy Wok restaurant in Wauwatosa, Wisconsin, were closing up shop at around 10:15 p.m., several masked men robbed them at gunpoint. (ECF No. 17-12 at 3.) After leaving the restaurant, the men used keys stolen during the armed robbery to burglarize the owners' nearby apartment, where their minor son was home alone. While the men were attempting to leave the apartment complex, one of them shot Abby Pavlik, a Wauwatosa police officer who was responding to the scene. (*Id.*) Dashcam evidence from Officer Pavlik's vehicle suggested that the shooting happened sometime between 10:38 p.m. and 10:42 p.m. (ECF No. 17-16 at 4; ECF No. 21 at 10-11.) The police followed shoe prints with a distinctive Nike pattern in the snow from the restaurant to the owners' apartment and then across the street, where they located one of the suspects, Michael Dengsavang, hiding under a tree. (ECF No. 17-12 at 3.) Along the path from the owners' apartment to the scene of the shooting, in the snow the police found several pairs of gloves, winter masks, hats, and the owners' apartment keys. Testing revealed the presence of Dengsavang's DNA on two of the gloves and a winter mask. (*Id.*)

I.   **State-court trial proceedings**

On December 19, 2009, Dengsavang was charged in Milwaukee County Circuit Court with armed robbery with use of force, burglary to a building, and attempted first-degree intentional homicide, all as a party to a crime. (ECF No. 10-1 at 41; ECF No. 17-22

2

at 2; ECF No. 17-23 at 23-32.) Two others were also charged for their role in the crimes. (ECF No. 17-5 at 2.) At a pretrial hearing a few days before trial, counsel for one of Dengsavang's co-defendants objected to the admission of a crime lab report concerning images of shoe prints found in the snow near the crime scenes that had been disclosed after the discovery deadline and just prior to trial. (ECF No. 17-21.) The report did not conclusively state that Dengsavang's shoes produced the prints in the snow, but it also did not rule them out. (ECF No. 17-2 at 65-66.) The trial court determined that, due to the late disclosure, the State could use the report in its case in chief only if the defense first "opened the door":

> I'm going to order the State can't use it in its case in chief. If for some reason the defense put on somebody or questioned somebody who talks about analyzing shoes or says something to the effect of well, you could have analyzed them, why didn't you analyze them, . . . those would be the kind of situations I will entertain an opening-the-door type issue, but it's going to be something like that . . . . It's not just going to be they talk about the prints because everyone's going to be talking about the prints. I'm talking about a specific opening the door of the shoes being analyzed.

(ECF No. 17-21 at 10:10-21.) Although Dengsavang's trial counsel was not present at the pretrial hearing, one of his associates covered for him. (*Id.* at 2:14-16; ECF No. 17-5 at 3.)

Dengsavang was tried in June 2010.[2] (ECF Nos. 17-22, 17-23, 17-24, 17-25, 17-26, 17-27, 17-28, 17-29, 17-30, 17-31.) The trial lasted five-and-a-half days, producing more than 1,000 pages of transcript and involving 37 witnesses and more than 300 exhibits. (ECF

---

[2] Dengsavang's co-defendants resolved their charges short of trial. (ECF No. 17-5 at 3 n.3.)

No. 17-12 at 3 n.2.) Because no eyewitness identified Dengsavang, much of the trial focused on the shoe print evidence. (ECF No. 17-12 at 4, 14.)

Detective Lisa Hudson, one of the crime scene investigators, testified during the State's case in chief that she had photographed numerous shoe prints leading out of the restaurant to the owners' apartment. (ECF No. 17-27 at 85:11-105:15; ECF No. 17-28 at 5:20-14:2.) Detective Hudson stated that one of the shoe prints found in the snow on the sidewalk outside the owners' apartment appeared to match Dengsavang's shoe. (ECF No. 17-27 at 95:15-97:5.) During cross-examination, Dengsavang's trial lawyer asked Detective Hudson if the shoe print in the snow "scientifically matched" Dengsavang's shoe; Detective Hudson responded that she couldn't say "because [she was] not a footwear expert." (ECF No. 17-28 at 16:6-17:4.) Dengsavang's counsel then referenced the crime lab report and confirmed via Detective Hudson that the crime lab analyst "could not make a positive identification." (*Id.* at 17:5-11.) Counsel also elicited testimony that Dengsavang's shoes were common, mass-produced Nikes. (*Id.* at 18:21-22:6.) On redirect, the State questioned Detective Hudson about the crime lab report. (*Id.* at 22:12-24:10.) Detective Hudson acknowledged that the crime lab analyst could not definitely identify Dengsavang's shoes as the only shoes that could have made the shoe prints found at the scene. (*Id.* at 23:3-13.) She also agreed that the analyst could not rule out Dengsavang's shoes as being capable of making the prints. (*Id.* at 23:14-24:2.)

4

The jury found Dengsavang guilty of all three charges. (ECF No. 17-31 at 6.) He was sentenced to consecutive sentences totaling fifty-five years of initial confinement and thirty years of extended supervision. (ECF No. 17-1.) The judgment of conviction was entered on July 29, 2010. (*Id.*)

II. **State-court post-conviction proceedings**

Dengsavang was appointed new counsel for post-conviction proceedings. (ECF No. 1 at 12.) On April 16, 2013, Dengsavang filed a motion for post-conviction relief, arguing that his trial lawyer provided ineffective assistance of counsel when he failed to object to Detective Hudson's testimony concerning the crime lab report, failed to present evidence and effectively argued that Dengsavang couldn't have shot Officer Pavlik because he was on the phone at the time of the shooting, and failed to effectively elicit testimony that Dengsavang did not match Officer Pavlik's initial description of the shooter. (ECF No. 17-2 at 32-76.) The circuit court denied the motion without a hearing. (*Id.* at 107-11.) Dengsavang appealed (ECF Nos. 17-2, 17-3, 17-4), and the Wisconsin Court of Appeals reversed, finding that Dengsavang was entitled to an evidentiary hearing on his claim concerning the crime lab report (ECF No. 17-5). The Wisconsin Court of Appeals subsequently granted the State's motion for reconsideration and clarified its decision, though the result remained the same. (ECF No. 17-6.) Thereafter, the Wisconsin Supreme Court denied the State's petition for review. (ECF No. 10-1 at 21; ECF Nos. 17-7, 17-8.)

5

On remand, the circuit court held an evidentiary hearing at which Dengsavang's trial lawyer and his former associate testified. (ECF Nos. 17-32, 17-33.) Trial counsel testified that he could not recall if he had a specific strategic purpose for questioning Detective Hudson about the crime lab report. (ECF No. 17-32 at 9:8-11, 13:8-21.) Counsel did testify, however, that he would not have asked about the report unless he had a purpose for doing so and he thought the report would help his client. (*Id.* at 22:15-24:9, 39:3-24.) Counsel also testified that his main trial strategy was to show that Dengsavang was innocent—he was in the wrong place at the wrong time and had been misidentified as being involved in the crimes—and that his questions to Detective Hudson were not inconsistent with that strategy, as they tended to show that the shoe prints could have been produced by anyone who had similar Nike shoes. (*Id.* at 7:8-14, 11:5-9, 17:18-18:19, 37:11-18:12.) Counsel thought he had given the jury enough to create reasonable doubt. (*Id.* at 38:13-19.)

With respect to the trial court's pretrial ruling concerning the admissibility of the crime lab report, counsel indicated that he had no independent recollection of the ruling, but he did remember discussing the hearing with the associate who appeared for him. (ECF No. 17-32 at 8:2-23.) Counsel testified that it was his practice to always discuss such matters with whoever covered for him, especially on important issues like the admissibility of evidence. (*Id.* at 19:3-20:18.) The former associate confirmed that practice, explaining that he would take voluminous notes, place them in the client file, and tell the

6

partner what had happened at the hearing. (ECF No. 17-33 at 8:7-9:9, 12:6-8, 14:20-8.) Although the associate initially testified that he had no specific recollection as to whether that practice was followed with respect to the pretrial hearing in question (*see id.* at 9:10-19, 12:20-25), he later indicated that he remembered calling trial counsel after the hearing to tell him what happened (*see id.* at 15:9-16:13).

Following the hearing the circuit court issued a written decision denying Dengsavang's post-conviction motion. (ECF No. 17-9 at 108-17.) Dengsavang appealed, arguing that his trial lawyer provided ineffective assistance of counsel when he opened the door to Detective Hudson's testimony concerning the crime lab report. (ECF Nos. 17-9, 17-10, 17-11.) On June 1, 2016, the Wisconsin Court of Appeals issued a written decision affirming Dengsavang's judgment of conviction and the order denying his post-conviction motion. (ECF No. 17-12.)[3] The court determined that trial counsel's opening the door to the shoe print report was neither ineffective nor prejudicial. (*Id.* at 13-16.) Dengsavang sought review of the appellate court's decision, raising the same claims presented on appeal. (ECF Nos. 17-13.) On September 8, 2016, the Wisconsin Supreme Court denied Dengsavang's petition for review. (ECF No. 17-14.) Dengsavang did not file a petition for certiorari in the United States Supreme Court. (ECF No. 10 at 9.)

Proceeding without the assistance of counsel, on August 11, 2017, Dengsavang filed a state petition for a writ of habeas corpus pursuant to Wis. Stat. § 809.51, arguing

---

[3] *State v. Dengsavang*, Appeal No. 2015AP637-CR, 2016 Wisc. App. LEXIS 334 (Wis. Ct. App. June 1, 2016).

7

that appellate counsel was ineffective for failing to make three arguments: (1) that his trial lawyer provided ineffective assistance of counsel by not presenting cell phone record evidence that Dengsavang could not have been the shooter because he was on the phone at the time of the shooting; (2) that reversal was appropriate in the interests of justice; and (3) that the post-conviction court erred in denying his motion for post-conviction discovery of exculpatory gunshot residue. (ECF No. 17-15.) On August 21, 2018, the Wisconsin Court of Appeals issued a written decision denying Dengsavang's state habeas petition *ex parte*. (ECF No. 17-16.) The court determined that the issues Dengsavang identified in his habeas petition were not clearly stronger than the issues appellate counsel raised on appeal. (*Id.* at 1.) With respect to Dengsavang's first argument, the court held that appellate counsel did not perform deficiently in failing to raise the cell phone record issue and that Dengsavang was not prejudiced by counsel's alleged error. (*Id.* at 3-6.) The court subsequently denied Dengsavang's motion for reconsideration. (ECF Nos. 17-17, 17-18.)

Dengsavang sought review of the appellate court's decision denying his state habeas petition. (ECF No. 17-19.) The Wisconsin Supreme Court summarily denied his petition for review on January 15, 2019. (ECF No. 17-20.)

### III. Federal habeas corpus proceedings

On March 5, 2019, Dengsavang filed a federal habeas petition raising seven potential grounds for relief. (ECF No. 1; *see also* ECF No. 2.) The matter was randomly

8

assigned to this Court. After the Court advised Dengsavang that several of his claims appeared to be unexhausted (ECF No. 6), Dengsavang elected to proceed on his two exhausted claims (ECF No. 10; *see also* ECF No. 9).[4] The Court then screened the amended petition and ordered a response from William J. Pollard, the then-Warden of Dodge Correctional Institution (where Dengsavang was and still is confined). (ECF No. 11.) On October 21, 2019, Pollard filed his answer (ECF No. 17) and a brief in opposition to Dengsavang's amended petition (ECF No. 18). Dengsavang filed a reply brief on February 19, 2020. (ECF No. 21.) All parties have consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). (ECF Nos. 5, 14.)

## STANDARD OF REVIEW

Dengsavang's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a prisoner in custody pursuant to a state-court judgment of conviction is entitled to federal habeas relief only if he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). With respect to claims adjudicated on the merits in state court, a federal court can grant an application for a writ of habeas corpus "only if the state court's decision was contrary to clearly established Supreme Court precedent, involved an unreasonable application of such precedent, or was based on an unreasonable determination of the facts

---

[4] Dengsavang also sought relief on a third issue (ECF No. 10-2 at 2), but he subsequently abandoned this claim (ECF No. 21 at 3).

in light of the evidence presented in state court." *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010) (citing 28 U.S.C. § 2254(d)); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

"A legal principle is 'clearly established' within the meaning of [§ 2254(d)(1)] only when it is embodied in a holding of [the Supreme Court]." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (citing *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state-court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13 (O'Connor, J., concurring). A state-court decision results in an "unreasonable application" of clearly established federal law when that court either "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

A writ of habeas corpus may not issue under the "unreasonable application" clause "simply because the federal court concludes that the state court erred. Rather, the applicant must demonstrate that the state court applied the Supreme Court's precedent in an objectively unreasonable manner." *Kubsch v. Neal*, 838 F.3d 845, 859 (7th Cir. 2016) (citing *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)). Thus, the petitioner "must show

10

that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Kubsch*, 838 F.3d at 859 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). For purposes of federal habeas review, state-court factual determinations are entitled to "substantial deference." *Brumfield v. Cain*, 507 U.S. 305, 314 (2015). To obtain relief under § 2254(d)(2), a petitioner must demonstrate that the state-court decision "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)); *see also* 28 U.S.C. § 2254(e)(1). "The decision must be 'so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable.'" *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (quoting *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)).

When applying the above standards, federal courts look to "the 'last reasoned state-court decision' to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

11

## ANALYSIS

Dengsavang alleges two grounds for relief in his amended petition: (1) ineffective assistance of trial counsel; and (2) ineffective assistance of appellate counsel.

### I. Ineffective assistance of trial counsel

Dengsavang first claims that his trial lawyer provided ineffective assistance of counsel by failing to prevent the admission of Detective's Hudson's testimony concerning the crime lab report. (ECF No. 10-2 at 1; ECF No. 21 at 3, 5-8.)

Criminal defendants have a constitutional right "to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To succeed on an ineffective-assistance-of-counsel claim under *Strickland*, a habeas petitioner "must show both that counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (citing *Strickland*, 466 U.S. at 688, 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[C]ourts need not address both prongs of *Strickland*" if the petitioner makes an inadequate showing as to one. *Atkins v. Zenk*, 667 F.3d 939, 946 (7th Cir. 2012) (citing *Strickland*, 466 U.S. at 697).

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. On habeas review, "[t]he question 'is not whether a federal court believes

12

the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, when a *Strickland* claim is evaluated under § 2254(d)(1), the standard of review is said to be "doubly deferential." *See Mirzayance*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam)).

The Wisconsin Court of Appeals addressed the merits of Dengsavang's ineffective-assistance-of-trial-counsel claim under the familiar *Strickland* framework. (ECF No. 17-12 at 13-14.) After summarizing Dengsavang's argument, the court determined that Dengsavang failed to establish that trial counsel was deficient in opening the door to Detective Hudson's crime lab report testimony. (*Id.* at 14-16.) The court first noted that about one third of the trial record involved testimony from witnesses, aside from Detective Hudson, who observed shoe prints in the snow and that numerous exhibits of shoe print photographs were admitted at trial. (*Id.* at 14.) Thus, Dengsavang's insistence that the jury would not have heard anything about shoe print evidence if counsel had not opened the door was simply inaccurate; "trial counsel knew that the jury was very aware of the shoe prints when he elicited testimony about the crime lab analysis." (*Id.*)

The court then determined that trial counsel's questioning of Detective Hudson was consistent with his reasonable trial strategy. (ECF No. 17-12 at 14-16.) The court noted

13

that, at the post-conviction hearing, trial counsel testified "that his general trial defense strategy was to show that Dengsavang was innocent, that the officer had identified the wrong person, that there was no direct evidence connecting him to the crime, and that he was simply caught in the wrong place at the wrong time." (*Id.* at 15.) Counsel further testified "that he asked questions of Detective Hudson about the crime lab report to show that 'there are millions of Nike shoes out there and they cannot specifically say these are Mr. Dengsavang's.'" (*Id.*) The court explained, "Although at the time of the *Machner* hearing, trial counsel could not recall his *specific* strategic purpose for opening the door to the testimony about the report, he did testify" that the only strategy for doing so would have been to create reasonable doubt; in other words, he would not have opened the door if he didn't think something positive could be found inside. (*Id.*) This was a reasonable strategy, in the court's view, given that the report was inconclusive as to whether Dengsavang's mass-produced Nike shoes matched the shoe prints found at the crime scene. (*Id.* at 15-16.)

The court also determined that Dengsavang failed to establish that he was prejudiced by his trial lawyer's alleged error, finding "no reasonable probability that Detective Hudson's testimony regarding the crime lab report affected the outcome of the trial." (ECF No. 17-12 at 16.). According to the court, "[t]he record demonstrates voluminous circumstantial evidence supporting the jury's verdict of guilt," including "a sea of testimony linking the shoe prints to Dengsavang." (*Id.*) The court further noted that

14

Detective Hudson's testimony "did not appear to have much probative value for the State, as the only salvageable evidence from the report was that it was *possible* Dengsavang's shoes *could have* made the shoe prints at the crime scene." (*Id.*) Even without Detective Hudson's testimony, "the jury still would have heard all of the other, stronger shoe print evidence." (*Id.*)

Dengsavang argues that the Wisconsin Court of Appeals unreasonably applied *Strickland* in denying his ineffective-assistance-of-trial-counsel claim. He challenges the trial court's ruling concerning the admissibility of the crime lab report on confrontation grounds (ECF No. 10-2 at 1; ECF No. 21 at 6-7), but that claim was not presented or exhausted in state court (*see generally* ECF Nos. 17-2, 17-4, 17-9, 17-11, 17-13, 17-15, 17-19). Thus, it is procedurally defaulted here.

Dengsavang also accuses the Wisconsin Court of Appeals of inventing a trial strategy to cover for counsel's errors. (ECF No. 21 at 7-8.) The Court disagrees with this characterization. The appellate court accurately quoted counsel's post-conviction testimony and acknowledged that counsel could not recall a specific strategy for opening the door to the crime lab report. Nevertheless, the court reasonably determined that trial counsel's questioning of Detective Hudson was consistent with his overall defense strategy. Moreover, Dengsavang's conclusory remark that Detective Hudson's testimony was "highly prejudicial" (*id.* at 6) is insufficient to establish prejudice under *Strickland*. The Wisconsin Court of Appeals reasonably determined that the testimony had little

15

probative value, as the report did not link Dengsavang to the crime scene or rule him out as a suspect. Finally, Dengsavang fails to explain how trial counsel's alleged failure to turn over his file to successor counsel, subsequent disciplinary action—including the suspension of his law license—and personal struggles at the time of Dengsavang's trial (*id.* at 8) impacted his representation, let alone how these "facts" rendered the appellate court's analysis unreasonable.

Accordingly, Dengsavang has not demonstrated that he is entitled to relief under § 2254(d) on his ineffective-assistance-of-trial-counsel claim.

## II. Ineffective assistance of appellate counsel

Dengsavang also claims that his appellate lawyer provided ineffective assistance of counsel by failing to argue that his trial lawyer was constitutionally ineffective for failing to emphasize exculpatory evidence. According to Dengsavang, trial counsel should have more effectively presented cell phone record evidence that, he says, would have proven that he could not have been the one who shot Officer Pavlik, as he was on the phone at the time of the shooting. Dengsavang maintains that his appellate lawyer erred in failing to preserve this issue on appeal and that this issue was clearly stronger than the issues counsel did pursue. (*See* ECF No. 10-2 at 1; ECF No. 21 at 8-12.)

Although "[t]he general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel," *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)), a "special gloss" applies

16

when a habeas petitioner challenges "the selection of issues to present on appeal," *Makiel*, 782 F.3d at 897. "Appellate counsel is not required to present every non-frivolous claim on behalf of her client." *Id.* (citing *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996)). Indeed, the "process of winnowing out weaker arguments . . . is the hallmark of effective appellate advocacy." *Makiel*, 782 F.3d at 897 (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)).

Appellate counsel's performance is thus deficient under *Strickland* "only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Makiel*, 782 F.3d at 898 (quoting *Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010); *Lee v. Davis*, 328 F.3d 896, 900-01 (7th Cir. 2003)). "Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult 'because the comparative strength of two claims is usually debatable.'" *Makiel*, 782 F.3d at 898 (quoting *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013)).

The Wisconsin Court of Appeals addressed the merits of Dengsavang's ineffective-assistance-of-appellate-counsel claim under *Strickland* and correctly noted that, to prove deficient performance, Dengsavang had to show that the cell phone records issue was clearly stronger than the issues appellate counsel raised on appeal. (ECF No. 17-16 at 3-4.) The court began its analysis by summarizing Dengsavang's argument, as raised in his initial post-conviction motion:

> Evidence presented to the jury tended to show that Officer Pavlik was shot at some point between 10:38 p.m. and 10:42 p.m. on December 13, 2009. Records from Dengsavang's cell phone show that on the evening of December 13, 2009, Dengsavang was on the phone at 10:36 p.m., 10:38 p.m.,

17

> 10:39 p.m., 10:41 p.m., 10:43 p.m., and 10:44 p.m. Despite the exculpatory nature of this evidence, [t]rial counsel failed to introduce it at trial.

(*Id.* at 4.) Applying the above standards, the court determined that the "issue of whether trial counsel was ineffective for not presenting [the cell phone record] evidence was not clearly stronger than the arguments counsel raised." (*Id.* at 6.) The court explained,

> Dengsavang makes too much of the cell phone records and the impact they would have had on the jury. He fails to account for the significant gaps between the phone calls when the shooting could have taken place or the fact that the evidence he relies on does not show that he was actually talking on the phone or picked up the calls.

(*Id.*) The court further determined that Dengsavang failed to demonstrate prejudice, reiterating that the "mountain of circumstantial evidence" was sufficient to sustain the guilty verdicts and would not have been diminished by "the inconclusive cell phone records." (*Id.* (quoting *Dengsavang*, Appeal No. 2015AP637-CR, 2016 Wisc. App. LEXIS 334, at *18 (Wis. Ct. App. June 1, 2016)).

Dengsavang argues that the Wisconsin Court of Appeals unreasonably applied the "clearly stronger" standard when the court denied his ineffective-assistance-of-appellate-counsel claim. He concedes that the state appellate court identified the appropriate standard but, in his view, the court never conducted a de novo review or compared the issues. (ECF No. 21 at 9-10.) By this he appears to suggest that the court was required to explicitly mention the issues appellate counsel did raise on appeal and compare each of those issues with the cell phone record issue. However, applying the clearly stronger standard does not involve such an exacting method of comparison. The court of appeals

18

determined that the cell phone record issue was not clearly stronger than the issues appellate counsel did pursue on appeal and explained why the cell phone record issue was weak. That was a reasonable application of the clearly stronger standard.

Dengsavang also argues that the Wisconsin Court of Appeals overlooked certain facts when it denied his ineffective-assistance-of-appellate-counsel claim. (ECF No. 21 at 9-12.) Dengsavang maintains that these facts show that "the window of time for the shooting was not as how the court see it." (*Id.* at 10-12.) However, the information he cites in support of these "facts"—including a dashcam recording from Officer Pavlik's vehicle and Officer Pavlik's police report (ECF No. 21-1)—does not call into question the state appellate court's factual findings. Indeed, it was Dengsavang who argued during his direct appeal that the shooting happened sometime between 10:38 p.m. and 10:42 p.m. (ECF No. 17-16 at 4.) The evidence Dengsavang cites is consistent with that timeline. Moreover, the facts the appellate court purportedly overlooked do not fill in the gaps of time between Dengsavang's phone calls around the time of the shooting or overcome the other evidence of his guilt. (ECF No. 21-1 at 7.) In other words, if true these facts fare little better in proving that Dengsavang was not the shooter. Dengsavang therefore has not demonstrated that his ineffective-assistance-of-appellate-counsel claim was rejected based on fact-finding that ignores the clear and convincing weight of the evidence presented in the state courts.

19

Accordingly, Dengsavang has not demonstrated that he is entitled to relief under § 2254(d) on his ineffective-assistance-of-appellate-counsel claim.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find the district court's "assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the Court cannot conclude that the assessment of the merits of Dengsavang's claims is debatable by reasonable jurists. Accordingly, a certificate of appealability will be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 10) is **DENIED**, and this action is **DISMISSED**. A certificate of appealability is **DENIED**. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 5th day of November, 2020.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge